IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**UNITED STATES OF AMERICA,**

v.   **Criminal Case No. 3:24cr59**

**LAVORIS COLEMAN,**

**Defendant.**

### MEMORANDUM OPINION

This matter comes before the Court on Defendant Lavoris Coleman's Motion to Dismiss the Indictment Due to Spoliation (the "Motion to Dismiss" or "Motion"). (ECF No. 60.) In the Motion, Mr. Coleman contends that the Court should dismiss his indictment under 18 U.S.C. § 922(g)(1)[1] because the United States failed to preserve "potentially useful" Tsunami camera footage in bad faith. (ECF No. 60, at 15.) In the alternative, Mr. Coleman asks the Court to "instruct the jury that it can presume that the Tsunami camera footage would have supported Mr. Coleman's defense." (ECF No. 60, at 1.) The United States responded to Mr. Coleman's Motion, (ECF No. 64), and Mr. Coleman replied, (ECF No. 66). Accordingly, this matter is ripe

---

[1] Section 922(g)(1) provides:

> (g) It shall be unlawful for any person—
>
>> (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year;
>> \* \* \*
>
> to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1).

for disposition. For the reasons articulated below, the Court will deny Mr. Coleman's Motion. (ECF No. 60.)

## I. Factual and Procedural Background

### A. Factual Background[2]

#### 1. Security Officers Observe Mr. Coleman With a Gun, Banging on an Apartment Door in Hillside Court

On the night of November 24, 2023, Willie Winbush and Jerrod Smith, security guards employed by Sentry Comm Security, were on patrol in Hillside Court in Richmond, Virginia. (ECF No. 55 ("Tr."), 96:2–97:9; 149:4–7.) Security Officers Winbush and Smith parked next to the Richmond Redevelopment Housing Authority ("RRHA") building on Harwood Street when they heard "maybe three or four shots in the back of the RRHA building." (Tr. 97:12–16; 98:10–13; 110:6–10; 150:1–4; *see also* ECF No. 54-20.) Upon hearing the shots, Sentry Officers Winbush and Smith got out of the car and "went around the building and looked." (Tr. 99:6–8.) Not seeing anything, they "came back around the building" and "at the first building on Harwood, at the second apartment," they saw a man "kicking and knocking on the door" holding a gun with a green laser on it. (Tr. 99:8–11; 100:21–25; 152:6–9; *see also* ECF No. 54-20.) Nobody else was outside. (Tr. 102:16–22; 153:19–21.) While banging on the door, the man was saying, "I'm going to shoot this sh** up if you don't open the door." (Tr. 153:15–18.) The man was wearing a white t-shirt and pants and, at the hearing, Security Officer Winbush identified him as the defendant, Mr. Coleman. (Tr. 103:22–104:5; ECF No. 54-12.)

Security Officer Smith called 911. (Tr. 101:7–8; 154:4–5.) Meanwhile, Security Officer Winbush crossed the street and asked Mr. Coleman, "Hey, what are you doing?" while placing

---

[2] The Court recounts the factual background as adduced during the August 20, 2024 hearing.

his hand on his own weapon. (Tr. 102:24–103:1.) Mr. Coleman turned toward him and then "turned back and started knocking and kicking again." (Tr. 103:1–14.) Officers Winbush and Smith heard a "young lady in the house [] telling him to go away." (Tr. 103:16–21; 153:6–9.)

### 2. Richmond Police Department Officers Arrive, Give Chase, and Apprehend Mr. Coleman

About "a minute or so" after Security Officer Winbush confronted Mr. Coleman and Mr. Coleman continued to knock on the apartment door, (Tr. 104:6–10), Richmond Police Department ("RPD") Officers William Richards and Lance Barnes-Christian responded to a 911 call reporting an attempted breaking and entering in Hillside Court.[3] (Tr. 169:8–9; 18–25; 204:17–20.) RPD Officer Richards was driving the patrol car while RPD Officer Barnes-Christian sat in the passenger seat. (Tr. 205:6–7.) In response to the call, the RPD officers drove on Harwood Street toward the security officers' location. (Tr. 112:3–9.) Not initially seeing Mr. Coleman or the security officers, they "made a right on Southlawn, came all the way around Southlawn and stopped at [the intersection of] Southlawn and Rosecrest." (Tr. 112:9–11; 154:16–24; *see also* ECF No. 54-20.) Security Officer Winbush then flashed a flashlight at the patrol car to flag the RPD officers down, and seeing the signal, the RPD officers "came up Harwood." (Tr. 112:11–12; 131:25–132:2; 155:1–2; 171:2–4; 15–16.)

---

[3] On the night of November 24, 2024, Takiya Brathwaite placed a 911 call reporting that her "ex" was banging on the door of her residence on Harwood Street with a gun in his hand. (Gov. Exh. 5, at 00:05–22; 00:50–01:49; Tr. 78:19–79:2.) She reported that the gun had a laser on it. (Gov. Exh. 5, at 01:49–54.) She reported that he was wearing a white shirt and grey sweatpants. (Gov. Exh. 5, at 2:42–48.) Ms. Brathwaite testified at the August 20, 2024 hearing before this Court. (Tr. 76:4–94:22.) However, inconsistently with the recorded 911 call she made that was entered into evidence, (Gov. Exh. 5), she testified that Mr. Coleman did not have a gun on the night of November 24, 2024. (Tr. 83:10–11.) In light of this inconsistency and the other evidence in the record before this Court, the Court assigns little weight to Ms. Braithwaite's testimony.

3

From inside the marked patrol car, RPD Officer Richards "saw a male with a green beam protruding from something in his right hand." (ECF No. 172:2–3.) RPD Officer Richards alerted RPD Officer Barnes-Christian, saying, "That's our guy." (Tr. 172:17–18.) RPD Officer Richards noted that "[t]he clothing description provided by security matched, along with the laser beam radiating from the firearm." (Tr. 172:18–20.) RPD Officer Richards "stop[ped] the vehicle" and "let Officer Barnes out." (Tr. 172:22.)

As two uniformed RPD officers approached, Mr. Coleman ran behind an adjacent apartment building. (Tr. 112:21–25; 113:3–4; 155:5–7; *see also* ECF No. 54-20.) Security Officers Winbush and Smith and RPD Officer Richards and Barnes-Christian all testified that they heard approximately (what would have been a second episode of) four shots being fired off. (Tr. 112:25–113:1; 155:15–16; 172:11–14; 211:14–23.) When RPD Officer Barnes-Christian got out of the car, Mr. Coleman "was on Lone Street behind the apartments." (Tr. 206:10–11.) RPD Officer Barnes-Christian ran after him. (Tr. 206:13–16.) In approximately "five or ten seconds," RPD Officer Richards was behind RPD Officer Barnes-Christian as they pursued the suspect, whom RPD Officer Richards (as had Security Officer Winbush) identified in court as the Defendant, Lavoris Coleman. (Tr. 172:24–173:4.)

"[A]s soon as [he] got out of the car, [RPD Officer Barnes-Christian] saw . . . Mr. Coleman" with "one hand on the dumpster" and "what [RPD Officer Barnes-Christian] believe[d] to be a firearm in his other hand." (Tr. 206:18–21.) Mr. Coleman "put [the firearm] in the trash can" and "took off running" when he saw RPD Officer Barnes-Christian. (Tr. 206:18–22; *see also* ECF Nos. 54-14, 54-15 (still images from RPD Officer Barnes-Christian's body camera footage showing Mr. Coleman standing next to the trash can with his back turned and taking off from the trash can).) RPD Officer Barnes-Christian credibly testified that

4

although the body camera footage does not clearly show the exact moment Mr. Coleman placed the gun in the trash can, he saw Mr. Coleman do so before he shined the light from his firearm onto the area. (Tr. 208:5–16.)

"About ten seconds after" RPD Officer Richards joined RPD Officer Barnes-Christian in chasing Mr. Coleman, caught Mr. Coleman, and placed him in handcuffs. (Tr. 173:11–14; Gov. Exh. 3, at 21:28:18–21.) Once Mr. Coleman was apprehended, RPD Officer Barnes-Christian immediately "went back to the same trash can [he] saw [Mr. Coleman] putting the firearm in and [he] recovered the firearm" with a green laser. (Gov. Exh. 3, at 21:28:21–50; Tr. 173:15–20; 174:11–12; 208:24–209:6; *see also* ECF Nos. 54-16; 54-17; 54-18; 54-19 (still images from RPD Officer Barnes-Christian's body camera footage showing RPD Officer Barnes-Christian opening the trash can and recovering a firearm).)

Security Officers Winbush and Smith then assisted Officer Richards in searching for and recovering shell casings while Officer Barnes-Christian took Mr. Coleman, handcuffed, to the patrol car. (Tr. 113:24–114:6; 156:2–7; 174:16–17.) Once Mr. Coleman was seated in the back of the patrol car, Officer Barnes-Christian read him his Miranda rights and asked him questions about why he had a firearm and Mr. Coleman responded that he had been attacked by people who shot at him. (Gov. Exh. 3, at 21:39:55–21:24:48; Tr. 212:5–7, 213:5–8.) At first, Mr. Coleman stated there were three people. (Gov. Exh. 3, at 21:41:16–22.) Approximately two minutes later, he said there were "four or five" people. (Gov. Exh. 3, at 21:43:33–41.)

Officer Barnes-Christian told Mr. Coleman, "I saw you put the firearm in the garbage," to which Mr. Coleman responded, "Cause I picked it, I, like, I don't know . . ." and trailed off. (Gov. Exh. 3, at 21:43:16–24.) Officer Barnes-Christian asked, "You fired how many shots, like two or three?" and Mr. Coleman answered, "Yeah, I don't know." (Gov. Exh. 3, at 21:44:09–

5

14.) Approximately one hour later, in front of the magistrate, Mr. Coleman stated, "I never had no firearm. Them people cahsed me and I ran for my f***ing life." (Def. Exh. 5B, at 23:15:20–27.)

### 3.     The Tsunami Cameras Present in Hillside Court

Tsunami cameras are cameras manufactured and owned by Ocean 10 Security. (Tr. 21:10–12; 41:9–11; 135:17–18.) Ocean 10 Security is a company that provides "approximately 90 Tsunami surveillance systems" to the RRHA. (Tr. 136:3–8.) Lieutenant James Killingworth from RPD testified that Tsunami cameras "are set throughout the Richmond Redevelopment Housing communities[.]" (Tr. 11:6–15.) Vice President of Public Safety for RRHA, Marty Harrison, affirmed that Tsunami cameras are present specifically in Hillside Court, and pinpointed their precise locations on a map. (Tr. 32:19–21; 33:22–34:24; *see also* ECF No. 54-21.) Tsunami cameras operate 24 hours a day, seven days a week; have four camera heads, providing a 360-degree range of view; can pan, tilt, and zoom; and produce clear footage even at night. (Tr. 12:5–7, 13:3–7; 33:1, 8–10; 35:12–13; 136:12–14.) Footage is stored on a Tsunami camera for 30 to 31 days, at which time the recording is automatically overwritten unless the footage is retrieved and preserved. (Tr. 139:1–10; ECF No. 54-2, at 1.)

Lieutenant Killingsworth explained that although RPD does not own or rent the cameras, they are able to access the cameras via a memorandum of understanding ("MOU") with RRHA. (Tr. 13:12–24; *see also* ECF No. 54-5.) The MOU, dated May 13, 2020, provides that RRHA "grants RPD local WiFi access and limited 4G LTE data access to the TSUNAMI for law enforcement purposes only" and stipulates that "'access' to the TSUNAMI shall include the ability to view, download, and reproduce video data[.]" (ECF No. 54-5, at 1 (emphasis in original).) The MOU expressly conditions such access "on written approval of a written request

6

for such access to the RHA Director of Public Safety ('DPS') or Chief Executive Officer ('CEO')" and states that RRHA "will only approve those requests for access which outline the scope of the requested access and the law enforcement purpose necessitating such access." (ECF No. 54-5, at 1.)

Lieutenant Killingsworth testified that RPD has "two administrators" that have direct access to the Tsunami cameras.[4] (Tr. 13:25–14:7.) He explained that patrol officers do not have access to Tsunami camera footage[5] but are able request that a detective in either the Strategic Violence Interdiction Unit or the Major Crimes Division download footage. (Tr. 10:20; 15:9–16:10; 19:18–20.) The relevant RPD detective then must send a written request to the Vice President of Public Safety for RRHA Marty Harrison. (Tr. 18:15–21; 19:21–24; 31:21–23.) Typically, the written request specifies the date and time of the footage sought, to which specific Tsunami camera the footage pertains, and the basis for the request. (Tr. 19:3–5.) Mr. Harrison testified that RRHA granted RPD permission to access or download Tsunami camera footage "on a case-by-case basis", (Tr. 37:18–19; 46:1–7), and that RPD was required to submit a written request prior to downloading or accessing footage, (Tr. 36:10–15; 37:5–17).

### 4. Officer Richard's Request for Tsunami Camera Footage From November 24, 2023

On the night of Mr. Coleman's arrest, Officers Barnes-Christian and Richards first discussed pulling footage from the Tsunami cameras. (Def. Exh. 2B, at 23:23:8–10; Tr. 189:6–12.) On December 10, 2023, 16 days later, arresting RPD Officer Richards sent an email to

---

[4] RRHA's Vice President for Public Safety Marty Harrison testified consistently. (Tr. 40:21–22) ("I believe there are two individuals at RPD that have login credentials [to the Tsunami camera system].").

[5] Lieutenant Killingsworth also testified that patrol officers do not receive training on Tsunami cameras. (Tr. 24:3–4.)

7

Lieutenant William C. Brereton and Sergeant Chris Williams, attaching a written request for the Tsunami camera footage capturing the events on November 24, 2023 involving Mr. Coleman. (ECF No. 54-11, at 1; ECF No. 54-9, at 3.) RPD Officer Richards testified that it was his first time requesting Tsunami camera footage and that he had not been trained on that procedure. (Tr. 189:24–190:5; 199:18–20.) He further testified that he submitted a request for Tsunami camera footage for the night of Mr. Coleman's arrest per the instructions of his lieutenant. (Tr. 194:9–195:1.)

The written request for Tsunami camera footage was signed by Sergeant Chris A.B. Williams, Sr. (ECF No. 54-9, at 3; ECF No. 54-11, at 1.) Also on December 10, 2023, Lieutenant Brereton forwarded the email containing the request to RPD Detectives Kenise D. Ford and Desiree A. Jones, copying Vice President of Public Safety for RRHA Marty Harrison, requesting that the detectives "download the tsunami camera footage Richard's is looking for". (ECF No. 54-11, at 1.)

No one responded until December 26, 2023—16 days after the initial request and 32 days after the November 24, 2023 incident—when Detective Jones wrote, "I am sorry to inform you that the video footage is no longer available." (ECF No. 54-11, at 1.) At the hearing, RPD Officer Richards testified that he did not follow up about the footage between December 10 and December 26, 2023. (Tr. 198:1–19.) He explained that on the day he submitted the request, he "was informed that they were on vacation at the time and they would handle it as soon as they got back." (Tr. 198:1–10.)

### 5. Related State Court Proceedings

On November 28, 2023, Mr. Coleman's City of Richmond public defender, who was appointed to represent him in his state court case on charges stemming from the same November

24, 2023 events, filed a motion in state court requesting from the Commonwealth of Virginia "any video or audio recording of all interactions between law enforcement and the defendant, whether by body camera, dashboard camera or other recording device, to be provided to the defendant no later than 10 days prior to the above court date [Dec. 21, 2023]." (ECF No. 54-7, at 1.)

### 6. The United States Takes Over Mr. Coleman's Prosecution

Mr. Coleman alleges that in December 2023, the United States Attorney General took the case over for prosecution under Project Exile.[6] (ECF No. 59-2, at 1.) On April 25, 2024, the United States served initial discovery on Coleman, including five body worn camera files. (ECF No. 22, at 13.) On June 6, 2024, counsel for Mr. Coleman emailed the United States requesting "[a]ny pole camera or surveillance video from Hillside for the incident or that time and date." (ECF No. 22, at 13.) Counsel for Mr. Coleman did not receive a response "and sent a follow[] up request on June 26, 2024." (ECF No. 22, at 13.) That same day, the United States responded that "there may have been flock cameras in the area" but "the time to recover that has passed" b/c "[t]he cameras only go back for 30 days." (ECF No. 22, at 13.) After subsequent inquiry by defense counsel, the United States confirmed on July 16, 2024, that "we do not have any camera footage preserved anywhere." (ECF No. 22, at 13.)

The United States asserts that it became aware for the first time—in late July or early August 2024—"that there might have [] been a request for Tsunami footage." (Tr. 67:18–22.) Previously, counsel for the United States had understood "that there wasn't a request made at all and therefore footage was not received." (Tr. 68:14–15.) Counsel for the United States

---

[6] Lieutenant Killingsworth testified that Project Exile "is the program where cases that originate with the Richmond Police Department or state law enforcement are selected for prosecution in federal court[.]" (Tr. 16:19–24.)

interviewed RPD Officer Richards on August 19, 2024, the day before the hearing before this Court. (ECF No. 54-9, at 1–2.) During the interview, RPD Officer Richards confirmed that he requested Tsunami camera footage, but "remembered getting an auto-generated reply email from a detective that informed him that someone in the request email chain was on vacation." (ECF No. 54-9, at 2.)

That day, on the eve of the hearing before this Court, the United States sent a report of investigation including the interview with RPD Officer Richards to counsel for Mr. Coleman. (Tr. 62:2–16.) Then, on the morning of the hearing, the United States provided to Mr. Coleman copies of the emails evincing RPD Officer Richards's request for Tsunami camera footage. (Tr. 63:24–64:1.)

### B. **Procedural Background**

On April 2, 2024, a grand jury returned a one-count indictment against Mr. Coleman for Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1, at 1.) On April 24, 2024, Mr. Coleman appeared before this Court and pled not guilty, (ECF No. 10, at 1), and is awaiting trial in this matter. On July 17, 2024, Mr. Coleman filed his First Motion to Dismiss Due to Destruction of Evidence (the "First Motion to Dismiss"). (ECF No. 22.) The United States responded, (ECF No. 30), and Mr. Coleman replied, (ECF No. 36).

On August 20, 2024, this Court held a hearing on Mr. Coleman's First Motion to Dismiss Due to Destruction of Evidence. (ECF No. 22.) That morning, counsel for Mr. Coleman filed a Status Report in which he notified the Court that the previous night at 8:22 p.m., the United States provided to Mr. Coleman via email a report of investigation of an interview with Officer Richards conducted by the United States earlier that day. (ECF No. 51, at 1.) Mr. Coleman attached the report of investigation to his Status Report. (ECF No. 51-1.) During the interview,

10

Officer Richards disclosed "that he did request the footage from Tsunami cameras in Hillside Court, for the area that would have shown the events surrounding Mr. Coleman's arrest on November 24, 2023." (ECF No. 51, at 1.) Officer Richards also stated "that his request was made through e-mail, that he recalled receiving an auto-generated out-of-office reply, and that no followup occurred." (ECF No. 51, at 1.) The United States also provided to Mr. Coleman "an attached request form signed by a Sgt. Chris Williams on December 10, 2023 – within the 27-30 day window in which the camera footage would still have been available." (ECF No. 51, at 1.) Also during the hearing, counsel for Mr. Coleman informed the Court that shortly before the hearing, "just in the hallway outside," the United States provided him with "copies of the e-mails that forwarded [Officer Richard's] request [for access to the Tsunami camera footage] to detectives within [Richmond Police Department] and also Marty Harrison." (ECF No. 55, at 63–64.)

As a result of the late disclosure of this evidence, the Court ordered the parties to re-brief Mr. Coleman's Motion. (ECF No. 55, at 223.) On September 18, 2024, Mr. Coleman filed a Motion Regarding Judicial Notice of Post-Hearing Discovery ("Motion Regarding Judicial Notice"). (ECF No. 59.) In the Motion Regarding Judicial Notice, Mr. Coleman "requests that the Court take judicial notice of an attached e-mail," which "was disclosed after the hearing, and therefore could not have been presented at the hearing." (ECF No. 59, at 3.) On November 15, 2024, the Court granted the Motion Regarding Judicial Notice. (ECF No. 67.)

On September 18, 2024, Mr. Coleman the Renewed Motion to Dismiss the Indictment Due to Spoliation. (ECF No. 60.) The United States responded in opposition, (ECF No. 64), and Mr. Coleman replied, (ECF No. 66).

11

## II. Standard of Review: Motion to Dismiss Indictment

Federal Rule of Criminal Procedure 12[7] allows parties to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). Mr. Coleman challenges his indictment, arguing that it should be dismissed because the United States failed "to preserve evidence that could have supported his defense at trial" in bad faith, violating Mr. Coleman's due process rights. (ECF No. 60, at 1.) Mr. Coleman argues that "[i]f the Court declines to find bad faith," it should allow an adverse jury instruction. (ECF No. 60, at 1.) Fed. R. Crim. P. 12(b)(3)(C)[8] permits a court to dismiss an indictment if there is "suppression of evidence." Fed. R. Crim. P. 12(b)(3)(C).

"[I]n deciding a pretrial motion to dismiss the indictment, 'a court may not dismiss an indictment . . . on a determination of facts that should have been developed at trial.'" *United*

---

[7] Rule 12(b)(1) provides:

> (b) PRETRIAL MOTIONS.
>
> > (1) *In General*. A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits. Rule 47 applies to a pretrial motion.

Fed. R. Crim. P. 12(b)(1).

[8] Rule 12(b)(3) provides, in pertinent part:

> (3) *Motions That Must Be Made Before Trial*. The following defenses, objections, and requests must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits:
>
> > \*   \*   \*
>
> > (C) suppression of evidence[.]

Fed. R. Crim. P. 12(b)(3).

*States v. Horma*, No. 3:18CR18 (MHL), 2018 WL 4214136, at *5 (E.D. Va. Sept. 4, 2018) (quoting *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012)). Rather, when considering a motion to dismiss an indictment, "the indictment allegations are presumed to be true." *United States v. Treacy*, 677 F. App'x 869, 873 (4th Cir. 2017) (citing *United States v. Stewart*, 744 F.3d 17, 21 (1st Cir. 2014)).

### III. Analysis

#### A. Legal Standard: Destruction of Evidence

It is a fundamental principle of due process that a defendant "is entitled to [be] made aware of, and to use, all evidence which tends to exculpate him of guilt of the charges against him." *United States v. Elliott*, 83 F.Supp.2d 637, 641 (E.D. Va. 1999). Indeed, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v Maryland*, 373 U.S. 83, 87 (1963). In other words, "[t]he suppression of material exculpatory evidence violates the right to due process, 'irrespective of the good faith or bad faith of the prosecution.'" *United States v. Johnson*, 996 F.3d 200, 206 (4th Cir. 2021) (quoting *Brady*, 373 U.S. at 87). However, the Supreme Court has held that destruction of evidence does not violate a defendant's due process rights when: (1) "the evidence was not destroyed by the government 'in a calculated effort to circumvent the disclosure requirements established by *Brady v. Maryland* and its progeny'"; (2) "the evidence was not constitutionally material"; and (3) "the likelihood that the evidence would have been exculpatory had it been preserved was small." *Elliott*, 83 F.Supp.2d at 642 (quoting *California v. Trombetta*, 467 U.S. 479, 488–89 (1984)).

13

"Four years later . . . the Supreme Court refined the test articulated in *Trombetta*, holding that 'unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.'" *Elliott*, 83 F.Supp.2d at 642 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) (emphasis omitted)). "Bad faith 'requires that the officer have intentionally withheld the evidence for the purpose of depriving the [defendant] of the use of that evidence during [their] criminal trial.'" *United States v. Adetayo*, 682 F. App'x 216, 217 (4th Cir. 2017) (quoting *Jean v. Collins*, 221 F.3d 656, 663 (4th Cir. 2000)). "The negligent destruction of evidence, without more, does not constitute bad faith." *Adetayo*, 682 F. App'x at 217 (citing *Elmore v. Ozmint*, 661 F.3d 783, 831 (4th Cir. 2011)).

A "possibility" that evidence "could have exculpated [a defendant] if preserved . . . is not enough to satisfy the standard of constitutional materiality in *Trombetta*." *Youngblood*, 488 U.S. at 56, n.\*. Rather, "the exculpatory value of the evidence must be apparent '*before* the evidence was destroyed'" to constitute a due process violation. *Id.* (quoting *Trombetta*, 467 U.S. at 489) (emphasis in original). "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56, n.\*; *see also United States v. Perry*, 92 F.4th 500, 513 (4th Cir. 2024) ("spoliation will only violate due process where 'the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant' yet still failed to preserve it") (quoting *Youngblood*, 488 U.S. at 58), *cert. denied*, 144 S.Ct. 2643 (Mem) (June 10, 2024) (No. 23-7413).

"Even absent a due process violation, a criminal defendant may be entitled to an adverse inference instruction pursuant to the spoliation of evidence rule." *Johnson*, 996 F.3d at 206.

"Under that evidentiary rule, 'an adverse inference may be drawn against a party who [loses or] destroys relevant evidence.'" *Id.* (quoting *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155 (4th Cir. 1995)). "In order to draw the inference, there must be 'a showing that the party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction.'" *Id.* (quoting *Vodusek*, 71 F.3d at 156)).

### B. There is No Due Process Violation Because Mr. Coleman Has Failed to Show Bad Faith Spoliation of Potentially Useful Evidence

Mr. Coleman concedes that the "exculpatory value of the [Tsunami camera footage] is uncertain." (ECF No. 60, at 14.) Instead, he argues that "the evidence was potentially useful" in Mr. Coleman's defense. (ECF No. 60, at 15.) Under Supreme Court precedent, a "possibility" that evidence "could have exculpated [a defendant] if preserved . . . is not enough to satisfy the standard of constitutional materiality in *Trombetta*." *Youngblood*, 488 U.S. at 56, n.*. Rather, "the exculpatory value of the evidence must be apparent '*before* the evidence was destroyed'" to constitute a due process violation. *Id.* (quoting *Trombetta*, 467 U.S. at 489) (emphasis in original). Because Mr. Coleman concedes that the exculpatory value of the Tsunami camera footage is uncertain, he does not meet the *Trombetta* materiality standard.

Thus, to constitute a violation of Mr. Coleman's due process rights, the Tsunami camera footage must have been destroyed in bad faith. *See Youngblood*, 488 U.S. at 57–58 (holding that, in situations where evidence "might have exonerated the defendant", "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law"). Mr. Coleman argues that the police's "failure to act to preserve the video they knew would be deleted" constituted bad faith because "they knew of [Mr. Coleman's] claim to have been assaulted and that someone else had

15

possessed and fired the gun . . . and knew that the footage would have shown what happened." (ECF No. 60, at 12–13.)

### 1. The Record Does Not Show That the Police Considered the Tsunami Camera Footage to be Potentially Exculpatory

Even assuming the unavailable Tsunami camera footage would have shown the interaction that Mr. Coleman claims to have occurred before the police arrived, the record—including body camera footage, officer testimony, and Mr. Coleman's own statements—does not reflect that the RPD officers considered the Tsunami camera footage to be potentially exculpatory or that they acted in bad faith in failing to preserve it. *See Perry*, 92 F.4th at 513 ("spoliation will only violate due process where 'the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant' yet still failed to preserve it.") (quoting *Youngblood*, 488 U.S. at 58), *cert. denied*, 144 S.Ct. 2643 (Mem) (June 10, 2024) (No. 23-7413). First, Security Officer Winbush credibly testified that he observed Mr. Coleman "kicking and knocking on the door" carrying a gun with a green laser. (Tr. 99:10–100:25.) Second, Security Officer Winbush confirmed that Mr. Coleman's clothing matched the clothing described in the 911 call placed by Takiya Brathwaite. (Gov. Exh. 5; Tr. 103:22–24.)

Third, RPD Officer Barnes-Christian credibly testified that he contemporaneously observed Mr. Coleman placing what RPD Officer Barnes-Christian believed to be a firearm in the trash can. (Tr. 206:18–21 ("[A]s soon as I got out of the car, I saw the suspect, Mr. Coleman. He had one hand on the dumpster at the time. And he had one hand -- he had what I believe to be a firearm in the other hand. He put it in the trash can.").) Fourth, this Court received body camera evidence showing Mr. Coleman with his hand on the dumpster and then flee when he

saw Officer Barnes-Christian.[9] (Gov. Exh. 3, at 21:27:34–38; Tr. 206:18–22; *see also* ECF Nos. 54-14, 54-15 (still images from Officer Barnes-Christian's body camera footage showing Mr. Coleman standing next to the trash can with his back turned and taking off from the trash can).) Fifth, after Mr. Coleman was apprehended, RPD Officer Barnes-Christian walked directly "back to the same trash can [he] saw [Mr. Coleman] putting the firearm in and [he] recovered the firearm." (Gov. Exh. 3, at 21:28:21–50; Tr. 173:15–20; 174:11–12; 208:24–209:6; *see also* ECF Nos. 54-16; 54-17; 54-18; 54-19 (still images from RPD Officer Barnes-Christian's body camera footage showing RPD Officer Barnes-Christian opening the trash can and recovering a firearm).) Finally, RPD Officer Richards credibly testified that the gun that RPD Officer Barnes-Christian recovered from the trash can had a "green laser", which is consistent with the recorded 911 call in which Ms. Braithwaite reported that the person banging on the door of his residence was carrying a gun with a laser. (Tr. 173:24–174:12; Gov. Exh. 5, at 01:49–54.)

Further, despite Mr. Coleman's statements that he was attacked, his responses to RPD Officer Barnes-Christian shortly after the time of arrest are inconsistent and cut against his argument that the police knew of any exculpatory value of the Tsunami camera footage. *See Youngblood*, 488 U.S. at 56, n.* ("The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed."). While Mr. Coleman was seated in the patrol car after being read his *Miranda* rights, Officer Barnes-Christian said to Mr. Coleman, "I saw you put the firearm in the garbage," and Mr. Coleman responded, "'Cause I

---

[9] "'[I]n appropriate circumstances, a consciousness of guilt may be deduced from evidence of flight.'" *United States v. Wilder*, 834 F. App'x 782 (4th Cir. 2020) (brackets in original) (quoting *United States v. Obi*, 239 F.3d 662, 665 (4th Cir. 2001)).

picked it, I, like, I don't know . . ." and trailed off. (Gov. Exh. 3, at 21:43:16–24.) Officer Barnes-Christian then asked, "You fired how many shots, like two or three?" and Mr. Coleman answered, "Yeah, I don't know." (Gov Exh. 3, at 21:44:09–14.) The inconsistent story Mr. Coleman told the magistrate approximately one hour later does not negate such a finding, especially because had this been said in the police car, law enforcement could have begun searching for the alleged attackers then.

The Court cannot conclude on this record—largely confirmed by video evidence—that any officer engaged in a "calculated effort" to circumvent constitutional requirements, *Trombetta*, 467 U.S. at 487, because the evidence here does not show that any officer would have believed that "the evidence would have been exculpatory" even to a "small" degree. *Elliott*, 83 F.Supp.2d at 642; *see also United States v. Hawkins*, 531 F. App'x 342, 344 (4th Cir. 2013) (concluding that a defendant "ha[d] not met the high bar for a failure to preserve evidence claim" when, although a video was destroyed showing the events in question, "[m]ultiple witnesses at trial testified to the events in question, relevant video footage was preserved and presented at trial, and there simply was no indication that the video that was destroyed included any footage that was exculpatory or otherwise inconsistent with the video that was retained").

        **2.    Specifically, Officer Richards's Request for the Tsunami Camera Footage Does Not Evince an Intentional Withholding of Evidence for the Purpose of Depriving Mr. Coleman of its Use**

RPD Officer Richards's submission of a written request for the Tsunami camera footage further cuts against Mr. Coleman's claim that the police failed to preserve the footage in bad faith. *Adetayo*, 682 F. App'x at 217 (citing *Jean v. Collins*, 221 F.3d at 663) (stating that "[b]ad faith 'requires that the officer have intentionally withheld the evidence for the purpose of depriving the [defendant] of the use of that evidence during [their] criminal trial.'").

18

RPD Officer Richards testified that it was his first time requesting Tsunami camera footage and that he had not been trained on that procedure at the time. (Tr. 189:24–190:5; 199:18–20.) He further testified that he submitted a request for Tsunami camera footage for the night of Mr. Coleman's arrest per the instructions of his lieutenant. (Tr. 194:9–195:1.) This conduct does not support a finding that RPD Officer Richards knew "that the evidence could form a basis for exonerating the defendant yet still failed to preserve it." *See Perry*, 92 F.4th at 513. RPD Officer Richard's failure to follow up after initially requesting the Tsunami camera footage, at most, shows negligence, which is insufficient for a finding of bad faith. *Adetayo*, 682 F. App'x at 217 ("The negligent destruction of evidence, without more, does not constitute bad faith.").

### 3. Mr. Coleman Fails to Show Bad Faith on the Part of the United States

Mr. Coleman further contends that "the United States is not blameless" because, he alleges, "the government had already made the decision to adopt this case after a thorough Exile review on December 5, 2023, before the footage [was] deleted" and yet failed to act to preserve the Tsunami camera footage. (ECF No. 60, at 13.) However, no indication exists that the United States was aware of any potentially exculpatory value of the footage. Rather, as explained above, the evidence that the United States did possess, including the body camera footage of both arresting officers, does not indicate that any other footage capturing the events would have proven exculpatory. Any failure by the United States to discover the Tsunami camera footage also amounts to only negligent conduct. *Adetayo*, 682 F. App'x at 217 ("The negligent destruction of evidence, without more, does not constitute bad faith."). As a result, Mr. Coleman has failed to show bad faith on the part of the United States.

### C.     Mr. Coleman is Not Entitled to an Adverse Jury Instruction

As an alternative to dismissing the indictment, Mr. Coleman asks the Court to "instruct the jury that it can presume that the Tsunami camera footage would have supported Mr. Coleman's defense." (ECF No. 60, at 1.) Under the spoilation of evidence rule, a criminal defendant may be entitled to an adverse inference instruction even absent a due process violation. *Johnson*, 996 F.3d at 206. "Under that evidentiary rule, 'an adverse inference may be drawn against a party who [loses or] destroys relevant evidence.'" *Id.* (quoting *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 155 (4th Cir. 1995)). However, "to draw the inference, there must be 'a showing that the party knew the evidence was relevant to some issue at trial and that his willful conduct resulted in its loss or destruction.'" *Id.* (quoting *Vodusek*, 71 F.3d at 156)). As articulated above, Mr. Coleman has not shown that the Tsunami camera footage was destroyed as the result of willful conduct by the police or prosecution. At most, he shows negligence. "In light of the 'willful conduct' requirement, the mere 'negligent loss or destruction of evidence' is an insufficient basis for an adverse inference." *Id.* at 217 (quoting *Vodusek*, 71 F.3d at 156). Therefore, the Court will decline to grant Mr. Coleman's alternative request for an adverse jury instruction.

### IV.  Conclusion

Because Mr. Coleman has failed to show bad faith on the part of the police or the United States, even assuming the Tsunami camera footage would have been "potentially useful" to Mr. Coleman's defense, its loss is not a due process violation. Thus, the Court will dismiss Mr. Coleman's Motion to Dismiss. (ECF No. 60.)

Date: 6/4/25
Richmond, Virginia

/s/ M. Hannah Lauck
United States District Judge